## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| WANYU ZHANG,<br><br>                    Plaintiff,<br><br>          v.<br><br>NATIONAL PUBLIC RADIO, INC.<br><br>                    Defendant. | Civil Action No. 25-699 (BAH)<br><br>Judge Beryl A. Howell |

## <u>MEMORANDUM OPINION</u>

Plaintiff Wanyu Zhang brings this action against her former employer, National Public Radio ("NPR"), for violating the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1324b (Count Two) and for employment discrimination, in violation of Title VII, 42 U.S.C. § 2000e-2 (Counts One and Two), and various common law claims of gross negligence (Count Three), wrongful termination (Count Four), promissory estoppel (Count Five), fraudulent misrepresentation (Count Six), and intentional infliction of emotional distress (Count Seven). Compl. 31-40, ECF No. 1. These claims arise from factual allegations that NPR negligently failed to re-verify her authorization to work in this country as a Chinese national and that such failure caused her visa to lapse, leaving her without legal immigration status from February 18, 2021, until August 30, 2023. Compl. ¶¶ 125-126. NPR discovered plaintiff's lapsed status in May 2023 and terminated her in June with the understanding, in plaintiff's view, that she would be rehired once she regained lawful status and work authorization. *Id.* ¶¶ 57, 65. Plaintiff obtained an H-1B visa in September 2023, but NPR nonetheless declined to rehire her. *Id.* ¶¶ 80-82, 87.

After unsuccessfully pursuing administrative remedies, *id.* ¶¶ 98, 100, 103, plaintiff filed this action, alleging that NPR's handling of her immigration status, termination, and refusal to rehire her, along with various occurrences during and after her employment at NPR, were

discriminatory decisions based on her national origin and citizenship and constituted various torts against her, *id.* ¶¶ 128-182. NPR now moves to dismiss all of plaintiff's claims for failure to state a claim, pursuant to Federal Rule of Civil Procedure 12(b)(6). Def.'s Mot. to Dismiss ("Def.'s MTD"), ECF No. 8. Plaintiff fails to state a claim for any of her causes of action, warranting grant of NPR's pending dismissal motion.

Additionally, as explained more fully below, due to the filing on plaintiff's behalf of an opposition brief containing two completely fictitious and eight seriously mischaracterized citations, plaintiff's counsel, Lev Ivan Gabriel Iwashko, is directed to pay NPR's attorneys' fees and costs associated with the filing of NPR's brief in reply to the flawed, and now stricken, opposition brief and response to the Court's October 23, 2025, Minute Order. *See* Def.'s Reply Mem. P. & A. in Supp. MTD ("Def.'s Reply"), ECF No. 10; Def.'s Resp. to Order of the Court ("Def.'s OTSC Resp."), ECF No. 12.

## I.    BACKGROUND

The factual background as laid out in the Complaint, along with the procedural background, are described next. At the motion to dismiss stage, all of plaintiff's allegations are taken as true and all inferences are drawn in her favor. *See infra* Part II.

### A.  Factual Background

### 1.  Plaintiff's Visa Status and Employment with NPR

Plaintiff is a Chinese national, who moved to the United States in 2009 on an F-1 student visa to pursue her bachelor's degree. Compl. ¶ 9. She graduated in 2013 and, on February 17, 2014, received an Optional Practical Training (OPT) extension to her F-1 visa, sponsored by her college, the University of Indiana Bloomington. *Id.* ¶¶ 10-11; *see Optional Practical Training (OPT) for F-1 Students* ("*OPT Info. Sheet*"), U.S. Citizenship & Immigr. Serv.,

https://www.uscis.gov/working-in-the-united-states/students-and-exchange-visitors/optional-practical-training-opt-for-f-1-students [https://perma.cc/B3KC-YFL7]. Her OPT status allowed her to stay in the United States and work in a job related to her college major for 12 months. *OPT Info. Sheet*; *see* Compl. ¶ 11.

From September 8, 2014, until February 17, 2021, plaintiff was employed by NPR in either part time or full time positions, while authorized to work in the United States under a series of OPT and F-1 authorizations, first from Indiana University Bloomington and then from Georgetown University, where she completed a master's degree in December 2018. Compl. ¶¶ 11, 14 (Sept. 8, 2014, to Feb. 17, 2015); *id.* ¶ 17 (Feb. 17, 2015, to Jan. 11, 2017); *id.* ¶ 20 (Jan. 11, 2017, to Feb. 18, 2018); *id.* ¶ 21 (Feb. 18, 2018, to Feb. 18, 2019); *id.* ¶ 25 (Feb. 18, 2019, to Feb. 17, 2021). Federal law requires employers to verify new employees' legal authorization to work in this country, called "I-9 verification." 8 U.S.C. § 1324a(a)(1)(B); *see* Form I-9, OMB 1615-0047, U.S. Citizenship & Immigr. Serv., https://www.uscis.gov/sites/default/files/document/ forms/i-9.pdf [https://perma.cc/95PU-K85P]. NPR requested, and plaintiff provided, I-9 verification forms and identification at various times, including on August 20, 2014, Compl. ¶ 13, on December 18, 2014, *id.* ¶ 15, between March and June of 2015, *id.* ¶ 18, in early 2018, *id.* ¶ 22, and around July 22, 2019, *id.* ¶ 27, with each occasion associated with a change in job title due to plaintiff's transfer and promotion within NPR.

Plaintiff's OPT work authorization expired on February 17, 2021, *id.* ¶ 25, and she apparently took no action to obtain further work authorization or lawful immigration status, *id.* ¶¶ 80, 125. Between July 22, 2019, and May 15, 2023, although plaintiff continued her employment and was granted further promotions, *id.* ¶¶ 25, 35, 37, 39, 45, NPR did not request I-9 verification from her, *id.* ¶ 27. The lapse in verification occurred because of a technical issue with NPR's

system that would normally remind NPR to request I-9 verification, compounded by human resources ("HR") staff turnover during COVID. *Id.* ¶ 94, 126. In April 2022, plaintiff was promoted to Brand Director, her most recent role at NPR. *Id.* ¶¶ 25, 45.

On May 15, 2023, after plaintiff told NPR that she wished to visit her ill mother in Beijing, China, NPR requested I-9 verification from her for the first time since 2019. *Id.* ¶¶ 55-56. She was unable to provide such verification because she did not have lawful status at the time. *Id.* ¶ 57. Stuart Harding, an in-house attorney for NPR, "assured [plaintiff] that he would seek advice from outside counsel to ensure she could maintain her employment in the U.S. with NPR, and did not foresee any issues." *Id.* ¶ 56.

On May 23, 2023, plaintiff again met with Harding, who informed her that she would need to stop working while NPR sponsored an H-1B visa application on her behalf. *Id.* ¶ 57; *H-1B Specialty Occupations* ("*H-1B Info. Sheet*"), U.S. Citizenship & Immigr. Serv., https://www.uscis.gov/working-in-the-united-states/h-1b-specialty-occupations [https://perma.cc/9A5V-NEW] (explaining that an H-1B visa allows an employer to sponsor a worker in a specialized occupation for a period of three years). Additionally, Harding "repeatedly emphasized the risk of an alleged 10-year travel ban with China" and told plaintiff that she "could not return to Beijing at this time" because she would "lose the opportunity to adjust her [immigration] status" if she did so. *Id.* Plaintiff "trust[ed] NPR and Mr. Harding's guidance" and "had no reason to doubt Mr. Harding's assurances," so she stayed in the United States, causing her to "miss[] the last three months of her mother's life." *Id.* ¶¶ 56-57.

Plaintiff coordinated with NPR's retained immigration counsel to prepare an H-1B visa application. *Id.* ¶¶ 61, 63. Meanwhile, she stopped working at NPR around June 5, 2023, per

Harding's instruction, *id.* ¶ 57, and on June 12, 2023, NPR sent plaintiff a separation letter "stating that [her] employment [with NPR] had officially ended effective June 2, 2023," *id.* ¶ 65.

On June 20, 2023, the Department of Labor approved NPR's Labor Condition Application ("LCA"), an initial step an employer must take before applying to sponsor an employee's H-1B visa.  *Id.* ¶ 66; *Labor Condition Application (LCA) Specialty Occupations with the H-1B, H-1B1, and E-3 Programs*, U.S. Dep't Lab., https://flag.dol.gov/programs/LCA [https://perma.cc/3KQ2-RKFZ].  The LCA covered the period June 26, 2023, to June 25, 2026, which plaintiff understood to mean that "NPR intended . . . to employ her under an H-1B visa" for that period of time.  *Id.* ¶ 66.

NPR submitted an H-1B visa application for plaintiff to United States Citizenship and Immigration Services ("USCIS") on July 12, 2023, and she completed the DS-160 form, her required portion of the H-1B application process, the following day.  *Id.* ¶¶ 69-70.  Unbeknownst to plaintiff at the time, NPR made two requests in its application: (1) that USCIS change plaintiff's status *nunc pro tunc* dating back to February 18, 2021, the day after her last OPT authorization had expired, thereby retroactively giving her lawful status for the approximately two-and-a-half-year period during which her status had lapsed, and (2) that USCIS approve plaintiff for an H-1B visa going forward for a period of three years from June 26, 2023, to June 25, 2026.  *Id.* ¶¶ 66, 126.  On July 19, 2023, USCIS issued a "Request for Evidence" to NPR, to which NPR responded on August 22, 2023.  *Id.* ¶¶ 71, 75.  During this process, plaintiff "felt abandoned by NPR" and that she "was left to process complex legal terms and jargon on her own," because NPR shared neither the H-1B petition nor its response to the Request for Evidence with her.  *Id.* ¶¶ 69, 76, 77.

On August 30, 2023, USCIS responded to NPR's petition.  *Id.* ¶ 78.  Although less than clear on this point, plaintiff alleges that USCIS denied NPR's petition to adjust her status *nunc pro*

*tunc* and thereby classify her as work authorized for the period from February 2021 until June 2023, when she had stopped working at NPR. *Id.* ¶ 78 (explaining that the 877-day lapse between the end of plaintiff's last OPT visa and NPR's petition for an H-1B visa and retroactive adjustment of status "result[ed] in a denial of change of the status from USCIS"); *id.* ¶ 80 (alleging that "USCIS granted [plaintiff] an H-1B Visa that was retroactively valid from February 18, 2021, through February 17,[ ]2024"); Def.'s MTD, Decl. of Stuart Harding ("Harding Decl."), ECF No. 8-2, Ex. 2, USCIS Decision Letter at 2 (Aug. 30, 2023), ECF No. 8-4 (declining to retroactively grant lawful status to plaintiff for the period from February 18, 2021, to August 30, 2023).[1] USCIS granted, however, an H-1B visa going forward from August 30, 2023, terminating on February 17, 2024, three years after plaintiff first lost work authorization. Compl. ¶¶ 80.

Plaintiff's mother passed away on August 29, 2023, the day before USCIS issued its decision. *Id.* ¶ 77. Upon seeing that her H-1B visa had been approved going forward, and despite NPR's admonishments to stay in the country because of an "alleged travel ban," *id.* ¶ 78, plaintiff booked a ticket to Beijing for August 31, 2023, to attend her mother's funeral in China. *Id.* ¶ 79. At this time, plaintiff believed she had been approved for an H-1B visa extending through June 2026. *Id.* ¶ 80.

To re-enter the United States on her H-1B visa, plaintiff was required to participate in an interview at the U.S. embassy in Beijing, *id.* ¶ 80; *H-1B Info. Sheet*, and she scheduled this interview scheduled for September 12, 2023, Compl. ¶¶ 73, 80. After repeated requests, Harding sent her USCIS's approval notice on the morning of her interview, which also notified plaintiff

---

[1]      The USCIS decision letter was submitted as an attachment to NPR's Motion to Dismiss and may be considered in resolving the pending dismissal motion, because this decision letter is incorporated by reference into the Complaint. *See infra* Part II (describing the materials that may be considered in deciding a motion to dismiss). The Complaint repeatedly references and describes the contents of the decision letter, including with quotations, primarily to argue that NPR was at fault for the lapse in plaintiff's immigration status, an integral element of her claims. Compl. ¶¶ 57, 65, 71, 78, 80, 94, 126, 144-145, 151-152, 171. Plaintiff does not contest the authenticity of the USCIS letter submitted by NPR with its motion to dismiss.

that she had been approved for an H-1B visa only through February 17, 2024.  *Id.* ¶ 80.  Her interview was successful, and later that week she received a visa stamp from the U.S. embassy allowing her to enter the United States from September 15, 2023, through February 17, 2024.  *Id.* ¶ 81.  She notified NPR of this outcome.  *Id.*

On September 20, 2023, NPR's immigration counsel reached out to plaintiff, who was still in China, and expressed concerns that the DS-160 form she had completed in August may have inaccurately answered the question whether she had previously had a "[visa] overstay or unlawful presence."  *Id.* ¶ 82.[2]  On September 27, 2023, Harding sent plaintiff an email and text indicating that because of this concern, NPR thought the visa process may need to be restarted.  *Id.* ¶ 84.  Nonetheless, plaintiff flew back to the United States on September 30, 2023, and successfully re-entered the country using her visa stamp.  *Id.* ¶¶ 85-86.

On October 4, 2023, Harding communicated to plaintiff, via phone and email, that NPR would not rehire her because NPR was concerned that her visa was based on an incorrect DS-160 form and was therefore "invalid."  *Id.* ¶ 87.  Harding told her that NPR had expected that, if she had correctly answered all questions on her DS-160, she would have been denied an H-1B visa at her September 13 embassy appointment due to her previous period of unlawful presence, after which NPR could have sought a waiver of plaintiff's inadmissibility under § 212(d)(3) of the INA.  *Id.*  After this, plaintiff received no further communication from NPR regarding her visa process or potential rehiring.  *Id.*  In her view, NPR's handling of her visa process reflected a "neglect of [her] well-being and career" and a "lack of guidance and clarity in managing [her] immigration situation."  *Id.* ¶¶ 87, 89.

---

[2]    NPR emphasizes its view that plaintiff's H-1B visa had likely been granted in reliance on a false answer she gave on her DS-160 form, since plaintiff had in fact overstayed her STEM OPT visa, which expired in February 2021, and that NPR therefore doubted the legality of employing plaintiff under the H-1B visa.  Def.'s MTD at 5.

Additionally, in October 24, 2024, approximately one year after NPR declined to rehire her, plaintiff alleges that someone she knew at NPR "reportedly overheard" a "non-legal staff member who is closely associated with [NPR's in-house] labor attorney Anika Steffen" refer to plaintiff "as an 'illegal Chinese immigrant' and question[] how [plaintiff] could dare accuse NPR of discrimination."  *Id.* ¶ 121.  Plaintiff characterizes this double hearsay as an indication that "confidential information" about her immigration status and visa process had been "shared inappropriately by NPR's legal team."  *Id.*

## 2.  Incidents of Workplace Discrimination

Plaintiff's claims primarily focus on the NPR's handling of her immigration situation, but she also alleges instances of discrimination relating to her rates of pay and promotion and to a generally "toxic work environment," *id.* ¶ 31, during and after her employment with NPR, as reviewed next.

### a.  Rate of Pay and Promotion

Beginning in June 2015, plaintiff was paid at a rate of $30 per hour to work in various internships and jobs for NPR.  *Id.* ¶ 19.[3]  She was repeatedly promoted to more advanced job titles, while her hourly rate remained the same until late 2019 or early 2020, when she received "some minimal financial compensation" for taking on "additional responsibilities" after a more senior manager departed the company.  *Id.* ¶¶ 24, 27-28.

On November 9, 2020, plaintiff was promoted to "Marketing Manager," and her pay was increased to $40 per hour.  *Id.* ¶ 35.  A month later, on December 9, 2020, NPR required plaintiff to contribute to NPR's Business Development team in addition to her existing marketing responsibilities, but "[d]espite the added responsibilities, [her] salary remained unchanged."  *Id.* ¶

---

[3]    Between September 8, 2014, and December 12, 2014, plaintiff allegedly received a "stipend of $4,900," Compl. ¶ 14, while her rate of pay from December 2014 through June 2015, is unspecified, *id.* ¶¶ 15-18.

37.  According to plaintiff, there was a "recurring pattern throughout her time at NPR" where she, "[a]s a Chinese, non-U.S. citizen employee, . . . was expected to take on more work without compensation."  *Id.*  On May 10, 2021, plaintiff was again promoted, this time to "Senior Marketing Manager," for which position she received a raise to $45 per hour or a salary of $95,060, "though her [pay] remained lower than peers with fewer duties."  *Id.* ¶ 39.

Shortly after plaintiff's promotion, her supervisor, Kristin Hume, promoted plaintiff's "peer," Elyse Poinsett, who is white, to be the Director of Marketing and plaintiff's supervisor.  *Id.* ¶ 40.  Shortly thereafter, plaintiff "received a call from CMO Michael Smith," who said that plaintiff "was fully capable of serving as a Director" but that she was "'too young to manage a team,'" a perspective that plaintiff viewed as an "unfair and subjective barrier."  *Id.*

Less than a year later, in April 2022, plaintiff was again promoted to the Brand Director position, and her salary was increased to $143,500.  *Id.* ¶ 45.  The promotion process "deviated from NPR's standard practices," in that plaintiff was required to "draft her own job description" and "perform [the new position's] duties for over six months" as she applied for the job and "attend[ed] multiple interviews" before being formally promoted.  *Id.*  Once promoted, she "received little support from NPR's HR department" with "hiring new designers or managing her expanded workload."  *Id.*

Subsequently, in the spring of 2023, NPR realized that plaintiff lacked work authorization and, after the events described *supra* Part I.A.1, terminated her employment formally in June 2023 and confirmed NPR would not re-hire her in October 2023.  On November 3, 2023, Selyn Hong, NPR's Chief People Officer, informed plaintiff that "she was ineligible for any severance pay," even though severance was "standard practice in such situations."  *Id.* ¶ 90.

In December 2023, NPR publicly posted a job opening for Brand Director at a salary of

$167,000—16.4% higher than what plaintiff had been paid for the same position.  *Id.* ¶ 92.  In April 2024, NPR extended an offer for the position to Russell Gossett, a "middle-aged Caucasian male."  *Id.* ¶ 106.

    *b.   Interactions with NPR Leadership*

In April 2020, the former Chief Marketing Officer ("CMO"), Meg Goldthwaite, on whose team plaintiff was an employee, departed from NPR.  *Id.* ¶ 30.  According to plaintiff, this departure stemmed from "long-standing issues related to the treatment of employees of color within the [marketing] division," citing that "[o]ver a span of two and a half years, seventeen . . . employees of color either quit, were fired, or were pushed out due to the toxic work environment created under the leadership of [Goldthwaite]," and that "seven of the 17 employees of color who left NPR did so directly as the result of the discriminatory and hurtful actions of NPR's leadership," and "[t]he departure of the CMO was seen as only a partial resolution" to these problems.  *Id.* ¶ 31.

Plaintiff describes having difficulties with Creative Director Billy Candela, who supervised her from October 2018 until April 2020.  *Id.* ¶¶ 24, 32.  In March 2019, plaintiff co-founded an employee resource group ("ERG") for Asian NPR employees, but "a few months later," Candela told her to "cease working on any ERG-related initiatives."  *Id.* ¶ 26.  Candela "publicly criticized Ms. Zhang's work as 'unacceptable and unprofessional' in front of multiple colleagues" and later "refused to . . . apologize."  *Id.* ¶ 34(A).  In plaintiff's view, Candela "disregard[ed] his team members' concerns and ideas," including by "fail[ing] to provide any meaningful direction or support" when plaintiff took on new job responsibilities.  *Id.* ¶ 34(B).  Candela "required [plaintiff] to draft her own job description multiple times," but "never reviewed or provided feedback, leaving her without a formal title or job description for over nine months."  *Id.* ¶ 34(C).  Under Candela's leadership, "white employees were promoted more quickly and received greater

recognition despite having fewer responsibilities." *Id.* ¶ 34(E).  Candela also commented that Indian food "mak[es] people stinky" and "question[ed] the hairstyles of a Black woman featured in creative assets." *Id.* ¶ 34(F).

In April 2020, plaintiff "request[ed] a transfer to another team" because Candela "refused to assign [her] new tasks," and this request was apparently granted because she was "required . . . to change her reporting status . . . to Director of Marketing Kristin Hume." *Id.* ¶¶ 32, 34(D). Following "multiple HR reports against [Mr. Candela] for discriminatory and abusive behavior," he resigned in September 2020. *Id.* ¶ 34.

### B. Procedural History

On February 4, 2024, plaintiff filed a report with the Department of Justice Immigrant and Employee Rights ("IER") section, which investigates violations of certain provisions of the INA, including 8 U.S.C. § 1324b.  Compl. ¶ 98.[4]  At some unspecified time later, the IER section told plaintiff that the case did not fall under its jurisdiction, "as it involved procedural negligence rather than discrimination under their enforcement scope." *Id.* ¶ 99.

On February 26, 2024, plaintiff filed a complaint with the Equal Employment Opportunity Commission ("EEOC"), *id.* ¶ 100, as required by 42 U.S.C. 2000e-5(e)(1), (f)(1), before a claim of employment discrimination in violation of Title VII may be brought in federal court.

On March 12, 2024, plaintiff filed two complaints of employment discrimination, one with the D.C. Office of Human Rights ("OHR"), Compl. ¶ 103, which dismissed the case for handling by the EEOC on April 23, 2024, *id.* ¶ 109; and another with the Department of Labor Wage and

---

[4]    In 2017, the "Special Counsel for Immigration-Related Unfair Employment Practices," as referred to in the Immigration and Nationality Act, 8 U.S.C. § 1324b(c)(1), was administratively renamed the Immigrant and Employee Rights Section of the DOJ and is referred to as the "IER section" herein. *Overview of the Immigrant and Employee Rights Section*, Dep't of Justice, https://www.justice.gov/crt/overview-immigrant-and-employee-rights-section [https://perma.cc/KWR3-E36S].

Hour Division, *id.* ¶ 103, which rejected the complaint on jurisdictional grounds on April 15, 2024, *id.* ¶ 107.

On December 9, 2024, the EEOC issued a right-to-sue letter to plaintiff, *id.* ¶ 123, and 89 days later, on March 8, 2025, plaintiff filed the instant Complaint, *see* Compl.; *see also* 42 U.S.C. § 2000e-5(f)(1) (allowing 90 days after issuance of right-to-sue letter for plaintiff to file a civil action). NPR moved to dismiss, *see* Def.'s MTD; Def.'s Mem. in Supp. of MTD ("Def.'s Mem."), ECF No. 8-1, and that motion was fully briefed, *see* Pl.'s Opp'n to MTD ("Pl.'s Opp'n"), ECF No. 9; Pl.'s Mem. P. & A. Opp'n to MTD ("Pl.'s Opp'n Mem."), ECF No. 9-1; Def.'s Reply.

Plaintiff's memorandum in opposition to NPR's Motion to Dismiss contained citations to two completely fictitious cases. *See* Minute Order to Show Cause ("OTSC") (Oct. 15, 2025). Eight additional cases were cited for propositions about issues not addressed in the cited cases. *Id.*; *see infra* Part III.H (describing the misleading citations). In response to the OTSC, plaintiff's counsel filed a notice explaining why these citations and characterizations appeared in the opposition memorandum and requesting that the memorandum not be stricken and that plaintiff's counsel, Lev Ivan Gabriel Iwashko, not be sanctioned for including multiple false citations in a filing. Pl.'s Resp. to OTSC ("Pl.'s OTSC Resp.") at 14-15, ECF No. 11; *see* Def.'s OTSC Resp. (providing defendant's positions on plaintiff's requests). The memorandum filed on plaintiff's behalf in opposition to NPR's motion to dismiss was stricken because the multiple false citations made the memorandum unreliable, Minute Order (Nov. 3, 2025), and plaintiff filed an amended opposition, Pl.'s Amended Mem. P. & A. Opp'n to MTD ("Pl.'s Amend. Opp'n"), ECF No. 13, to which NPR submitted a second reply, Def.'s Second Reply.

NPR's motion to dismiss is now ripe for resolution.

## II.     LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," although the allegations need not be "detailed." *VoteVets Action Fund v. U.S. Dep't of Veterans Affs.*, 992 F.3d 1097, 1104 (D.C. Cir. 2021) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The alleged facts must not be "'merely consistent with' a defendant's liability" but rather must "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556-57 (2007)). "[A] complaint survives a motion to dismiss even '[i]f there are two alternative explanations, one advanced by [the] defendant and the other advanced by [the] plaintiff, both of which are plausible.'" *VoteVets Action Fund*, 992 F.3d at 1104 (last three alterations in original) (quoting *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015)). All factual allegations in the complaint must be accepted as true, "even if doubtful in fact," *Twombly*, 550 U.S. at 555, though the court does "not assume the truth of legal conclusions, nor . . . 'accept inferences that are unsupported by the facts set out in the complaint,'" *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015) (citation omitted) (quoting *Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 732 (D.C. Cir. 2007)).

In assessing the sufficiency of a complaint under Rule 12(b)(6), a court's consideration is limited "to materials properly before it," including, in this Circuit, "'the facts alleged in the complaint, [and] documents attached thereto or incorporated therein.'" *Page v. Comey*, 137 F.4th 806, 813 (D.C. Cir. 2025) (alterations in original) (quoting *Stewart v. Nat'l Educ. Ass'n*, 471 F.3d 169, 173 (D.C. Cir. 2006); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (a court deciding motion to dismiss may consider "documents incorporated into the

complaint by reference, and matters of which the court may take judicial notice").   A document may be considered incorporated into the complaint by reference, even if not attached to the complaint, if the document is "referred to in the complaint and [is] integral to [the plaintiff's] . . . claim" and the "authenticity" of the copy submitted to the court, for instance, as an exhibit during briefing of a motion to dismiss, "is not disputed."  *Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004).

## III.    DISCUSSION

Plaintiff alleges seven separate counts in her complaint, each of which addressed in turn, followed by a discussion of the sanctions warranted against plaintiff's counsel.

### A.  Count One: Title VII (National Origin and Citizenship Discrimination)

Plaintiff alleges that NPR discriminated against her "based on national origin and citizenship," Compl. ¶ 129, in violation of Title VII, which prohibits employers from "fail[ing] or refus[ing] to hire or . . . discharg[ing] any individual, or otherwise . . . discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin," 42 U.S.C. § 2000e-2(a)(1).  This claim is based primarily on NPR's failure to rehire her after she obtained an H-1B visa, Compl. ¶ 139, but plaintiff also points to the allegedly "adverse actions" of her lack of severance, "pay inequity, denial of advancement, and termination" due to her "national origin" and "citizenship status," and a "hostile work environment."  *See* Pl.'s Amend. Opp'n at 16; Compl. ¶ 90 (severance); *id.* ¶¶ 24, 27-28, 37, 39, 92 (pay); *id.* ¶¶ 34(E), 40 (promotion); *id.* ¶¶ 57, 64-65 (initial termination); *id.* ¶¶ 31-34 (hostile work environment).

#### *1.   Threshold Issues*

Before addressing the substance of plaintiff's claims, clarification of two legal issues is helpful.

First, citizenship is not a protected characteristic under Title VII. *Espinoza v. Farah Mfg. Co.*, 414 U.S. 86, 95 (1973). Nor did "Congress . . . intend the term 'national origin' to embrace citizenship requirements," *i.e.*, to prohibit employers from declining to hire non-citizens. *Id.* at 89. In some situations, "a citizenship requirement might be but one part of a wider scheme of unlawful national-origin discrimination," but discrimination based on citizenship is not itself prohibited by Title VII. *Id.* at 92; Pl.'s Amend. Opp'n at 15. Title VII liability depends on whether NPR discriminated against plaintiff based on her Chinese national origin, including by using citizenship as a "pretext" for such discrimination, not whether NPR discriminated against plaintiff based on her citizenship status. *Espinoza*, 414 U.S. at 92.

Second, Title VII requires an employee to file an administrative complaint with the EEOC and receive a right-to-sue letter prior to filing suit in federal court in compliance with certain deadlines. *See* 42 U.S.C. § 2000e-5(e)(1), (f)(1). Plaintiff filed the requisite complaint with the EEOC, Compl. ¶ 100, and her compliance with the relevant deadlines is not contested. *See* Def.'s MTD at 7-8; *Fort Bend Cnty. v. Davis*, 587 U.S. 541, 550-51 (2019) (holding that Title VII's administrative exhaustion requirements are non-jurisdictional claim-processing rules that may be forfeited by defendant-employers who fail to raise them as a defense).

Although an employee is not limited to alleging the precise facts in her federal court case as in the EEOC complaint, "[a]llowing a complaint to encompass allegations outside the ambit of the predicate EEOC charge would circumvent the EEOC's investigatory and conciliatory role, as well as deprive the charged party of notice of the charge, as surely as would an initial failure to file a timely charge." *Marshall v. Fed. Exp. Corp.*, 130 F.3d 1095, 1098 (D.C. Cir. 1997) (quoting

*Schnellbaecher v. Baskin Clothing Co.*, 887 F.2d 124, 127 (7th Cir. 1989)). "A Title VII lawsuit following the EEOC charge is limited in scope to claims that are 'like or reasonably related to the allegations of the charge and growing out of such allegations.'" *Park v. Howard Univ.*, 71 F.3d 904, 907 (D.C. Cir. 1995) (quoting *Cheek v. W. & S. Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994)). Consequently, though plaintiff need not have alleged in the EEOC complaint every detail she might later raise in a civil suit, "[t]he scope of the civil action is confined . . . by the scope of the administrative investigation that can reasonably be expected to follow the charge of discrimination." *Chisholm v. U.S. Postal Serv.*, 665 F.2d 482, 491 (4th Cir. 1981); *Park*, 130 F.3d at 1098 (citing *Chisholm* for this proposition).

Plaintiff's EEOC complaint focuses primarily on NPR's failure to rehire her after she obtained an H-1B visa but also mentions NPR's alleged negligence in not noticing the three-year lapse in her immigration status, and failure to offer her "any severance or emotional support." *See* Def.'s Reply, Second Decl. of Stuart Harding ("Second Harding Decl."), ECF No. 10-1, Ex. 1, EEOC Complaint, ECF No. 10-2.[5] The EEOC complaint does not mention NPR's formal termination of plaintiff in June 2023, but that initial separation appears "reasonably related to" both NPR's alleged negligence regarding I-9 verifications and eventual refusal to rehire her, *Park*, 71 F.3d at 907 (quoting *Cheek*, 31 F.3d at 500), and thus within the "scope of [any] administrative investigation that [could] be reasonably expected to follow" her charge that NPR's eventual failure to rehire her was discriminatory, *Chisholm*, 665 F.2d at 491. Accordingly, plaintiff has exhausted her administrative remedies for these claims.

---

[5] The EEOC complaint, which was submitted as an exhibit to NPR's reply in support of its motion to dismiss, *see* EEOC Complaint, may be considered at this stage because the Complaint incorporated the EEOC complaint by reference. *See supra* Part II. The Complaint mentions the EEOC complaint and correctly acknowledges that the filing of the EEOC complaint and subsequent issuance of a right-to-sue letter were prerequisites to the filing of this action. Compl. ¶¶ 100, 123. The EEOC complaint is "integral to [plaintiff]'s exhaustion of administrative remedies, and [is a] public record[] subject to judicial notice," *Laughlin v. Holder*, 923 F. Supp. 2d 204, 209 (D.D.C. 2013), and therefore may be considered at this stage.

At the same time, to the extent plaintiff intends to allege "pay inequity[] [and] denial of advancement" as discriminatory adverse actions, Pl.'s Amend. Opp'n at 16, or a "hostile work environment" based on her national origin, Compl. ¶¶ 31-34, she has failed to exhaust her administrative remedies and may not raise those claims here, though the underlying facts may be used as "background evidence" to support her surviving allegations. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002).

### 2. *Remaining Claims of National Origin Discrimination*

Setting aside plaintiff's claims of citizenship discrimination and those she has failed to administratively exhaust, what remains are her allegations that, based on her Chinese national origin, NPR (1) terminated her in June 2023, (2) declined to rehire her in October 2023, (3) "negligently mishandled the I-9 verification process and paperwork," and (4) "refused to provide any severance" after her termination. EEOC Complaint at 2; Compl. ¶¶ 57, 63-65, 87, 90.

The "two essential elements of a discrimination claim are that (i) the plaintiff suffered an adverse employment action (ii) because of the plaintiff's race, color, religion, sex, [or] national origin." *Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008). "An adverse employment action sufficient to sustain a Title VII discrimination claim must amount to a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits.'" *Gomez v. McDonough*, No. 21-cv-1685 (BAH), 2022 WL 1471375, at *7 (D.D.C. May 10, 2022) (quoting *Douglas v. Donovan*, 559 F.3d 549, 552 (D.C. Cir. 2009)). "[N]ot everything that makes an employee unhappy is an actionable adverse action." *Douglas*, 559 F.3d at 552 (quoting *Russell v. Principi*, 257 F.3d 815, 818 (D.C. Cir. 2009)); *see also Burlington N. & Santa Fe. Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (explaining that Tile VII "does not set forth 'a

general civility code for the American workplace'" (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998))).  A plaintiff need not show "objectively tangible harm" for an employer's action to constitute an actionable adverse employment action, but nonetheless must still demonstrate an adverse effect on her "terms, conditions, or privileges of employment."  *Chambers v. District of Columbia*, 35 F.4th 870, 874-75 (D.C. Cir. 2022).

Plaintiff's termination in June 2023 and NPR's refusal to rehire her in October 2023 both constitute adverse employment actions, namely "discharge" and "fail[ure] . . . to hire," 42 U.S.C. § 2000e-2(a)(1).  Failure to offer plaintiff severance is also an adverse employment action.  *See Gerner v. Cnty. of Chesterfield*, 674 F.3d 264, 268-69 (4th Cir. 2012) (holding that severance is a term of employment and that discriminatory distribution of severance can give rise to a disparate treatment claim); *see also Hishon v. King & Spalding*, 467 U.S. 69, 75 (1984) ("A benefit that is part and parcel of the employment relationship may not be doled out in a discriminatory fashion, even if the employer would be free . . . not to provide the benefit at all."); *id.* at 77 ("A benefit need not accrue before a person's employment is completed to be a term, condition, or privilege of that employment relationship.  Pension benefits, for example, qualify as terms, conditions, or privileges of employment . . . .").

NPR's alleged negligence in failing to conduct I-9 verifications between July 22, 2019, and May 15, 2023, does not constitute an adverse employment action.  I-9 verification is a statutory duty owed to the government, not a process undertaken for the benefit of the employee, *see infra* Part III.C, and therefore is not a term or condition of employment.  In any case, plaintiff has not drawn any connection between her national origin and NPR neglecting to conduct I-9 verifications of her.  Indeed, she attributes NPR's failure to verify her to "issues with NPR's I-9 re-verification system caused by HR staff turnover."  Compl. ¶ 94.  Even construed liberally, the Complaint

contains no allegation that the lapse in I-9 verification modified the terms or conditions of plaintiff's employment or that that the lapse was discriminatory.

Plaintiff has thus shown only three adverse employment actions: (1) the June 2023 termination; (2) the October 2023 refusal to rehire; and (3) lack of severance. That does not end the inquiry; plaintiff must also make a plausible case that links those actions to her Chinese national origin. *See Heavans v. Dodaro*, 648 F. Supp. 3d 1, 14 (D.D.C. 2022). On this critical linkage, plaintiff has offered little evidence that the June 2023 termination had anything to do with her national origin. According to plaintiff, NPR's counsel explained that she would need "to stop working while NPR handled her work visa application," because "she temporarily lacked legal authorization to work." Compl. ¶ 57. As explained in the Complaint, as of June 2023, her last visa had expired more than two years prior, in February 2021. *Id.* ¶ 80. She does not allege that NPR outwardly expressed bias against Chinese people or otherwise expressed that her Chinese national origin was the basis for its decision to terminate her pending proper work authorization, nor does she point to any comparators who were retained while lacking legal authorization to work. *See id.* ¶¶ 56-57 (describing NPR's decision to terminate her pending work authorization). Plaintiff's national origin is mentioned only in passing throughout the Complaint, and not at all in relation to her allegations about termination, failure to rehire, or failure to offer severance. *See id.* ¶ 9 (mentioning that plaintiff immigrated from China in 2009); *id.* ¶¶ 135-136 (focusing on showing the NPR terminated and refused to rehire her based on her citizenship status); *id.* ¶ 90 (discussing denial of severance without mention of national origin). While factual allegations that plaintiff was paid less and promoted more slowly could constitute evidence of a general animus toward her based on her national origin, even those allegations are only connected to her national origin in a conclusory manner. *See id.* at ¶¶ 26, 37, 40. For instance, plaintiff points to an instance

in 2021 in which she was passed over for promotion in favor of a "Caucasian" coworker, but appears to credit (though disagree with) NPR's explanation that her coworker was older and that plaintiff was "too young to manage a team." *Id.* ¶ 40. These thin allegations do not provide plausible support for the proposition that plaintiff was terminated, almost two years later, because of her national origin.

Nor has plaintiff plausibly alleged that NPR implemented a "citizenship requirement" that was "but one part of a wider scheme of unlawful national-origin discrimination." *Espinoza*, 414 U.S. at 92. Indeed, plaintiff has not shown or even suggested that NPR implemented a general ban on hiring noncitizens—to the contrary, she emphasizes that NPR completed "five I-9 verification processes" and knew that she was a noncitizen immigrant for her entire tenure with NPR. Compl. ¶ 131.

Similarly, plaintiff alleges no information tending to show that NPR's failure to rehire her in October 2023 resulted from discrimination against her because she was Chinese. *See id.* ¶ 87. Instead, plaintiff hypothesizes that the decision not to rehire her "appeared to be motivated by NPR's desire to avoid potential liabilities associated with their earlier administrative errors." *Id.* ¶ 126. At most, plaintiff makes the conclusory statement that the "refusal to recognize Plaintiff's valid visa is a direct case of discriminatory behavior." *Id.* ¶ 136.

Plaintiff's allegation that NPR decided she was "ineligible for any severance pay" similarly lacks any link to her national origin. *Id.* ¶ 90. For instance, although she states that severance was "standard practice in such situations," she does not point to any other individual who received severance after being terminated for lack of work authorization for the prior two-year period, or, for that matter, to any other individual who received severance at all. *Id.*

Finally, as evidence that NPR had discriminatory motives prompting any of these three adverse employment actions, plaintiff points to an overheard comment retold to her. Specifically, a year after NPR declined to rehire her, a "staff member" at NPR was "overheard" calling plaintiff an "illegal Chinese immigrant." *Id.* ¶ 121. Plaintiff complains that this staff member would only have had information about her immigration status if such information was "inappropriately shared." *Id.* No matter if being so characterized by a former employer is hurtful to plaintiff, the legal issue presented is whether an allegation based on double (or triple) hearsay supports a claim of employment discrimination, and it does not. Such a comment, allegedly made a year after NPR's decision not to rehire plaintiff, by a staff member who was uninvolved in the decision to end her employment and not to rehire her or offer her severance, does not give rise to a plausible inference that any of those decisions were made due to plaintiff's national origin.

***

In sum, plaintiff alleged several adverse employment actions for which she has exhausted her administrative remedies under Title VII but has not plausibly alleged that NPR was motivated to take those actions, even in part, because plaintiff is from China. Her Title VII claim is therefore be dismissed for failure to state a claim.

## B. Count Two: Violation of the Immigration and Nationality Act

Plaintiff claims that NPR violated 8 U.S.C. § 1324b by discriminating against her based on her national origin and citizenship and by refusing to accept her H-1B visa and rehire her in October 2023.[6] Section 1324b prohibits "discriminat[ion] . . . with respect to the hiring . . . of [an]

---

[6] Plaintiff also cites Title VII as a source of liability for this count but appears to rely primarily on INA provisions. The INA's § 1324b does not cover any discrimination already prohibited by Title VII, and thus liability may not arise jointly under these two statutes. *See* 8 U.S.C. § 1324b ("[The provision prohibiting excessive documentation requirements] shall not apply to . . . a person's or entity's discrimination because of an individual's national origin if the discrimination with respect to that person . . . is covered under section 703 of the Civil Rights Act of 1964 . . . ."). Indeed, § 1324b prohibits the simultaneous filing of EEOC charges under Title VII and charges

individual for employment or the discharging of [an] individual from employment . . . because of such individual's national origin, or . . . in the case of a protected individual . . . , because of such individual's citizenship status." 8 U.S.C. § 1324b(a)(1).  The statute defines "protected individual" as a "citizen or national of the United States," "an alien who is lawfully admitted for permanent residence," or immigrants on certain visas not relevant here.  *Id.* § 1324b(a)(3).  The statute also clarifies that an employer's "request, for the purposes of satisfying the requirements of [I-9 verification], for more or different documents than are required . . . or refusing to honor documents tendered that on their face reasonably appear to be genuine shall be treated as an unfair immigration-related employment practice if made for the purpose or with the intent of discriminating against an individual in violation of paragraph (1)."  *Id.* § 1324(a)(6).  Plaintiff thus alleges that NPR's refusal to accept her facially valid H-1B visa in October 2023 violated § 1324a(a)(1), (a)(6).  *See* Compl. ¶¶ 142-143.

Plaintiff's claim in Count Two is barred by her failure to exhaust administrative remedies. Section 1324b does not create a private right of action to file actions in federal court.  8 U.S.C. § 1324b(b)(1); *see Ravines de Schur v. Easter Seals Goodwill N. Rocky Mountains, Inc.*, No. 22-4055, 2023 WL 4635890, *3-4 (9th Cir. July 20, 2023) (§ 1324b does not create private right of action to bring civil case outside administrative process); *Isidore v. Westport Linen Servs., LLC*, No. 25-cv-410 (CJB), 2025 WL 3240425, *2 (E.D. La. Nov. 20, 2025) (same); *Jean-Louis v. Cmty. Agency for Senior Citizens*, No. 25-cv-2820 (LLS), 2025 WL 2662515, *2 (S.D.N.Y. Sept. 17, 2025) (same).  Instead, § 1324b(b)(1) permits employees to file a complaint with the IER section, which is tasked to "investigate each charge received" and "within 120 days of the receipt of the charge" either decline to prosecute or bring the case before "an administrative law judge

---

with the IER section under § 1324b, emphasizing that an employee cannot pursue relief under both statutes.  8 U.S.C. § 1324b(b)(2).  Therefore, plaintiff's Count Two is construed to arise only under the INA § 1324b.

[("ALJ")]." 8 U.S.C. § 1324b(d)(1). "If [the IER section] . . . has not filed a complaint before an administrative law judge . . . within such 120-day period, . . . the person making the charge may . . . file a complaint directly before such a judge within 90 days." *Id.* § 1324b(d)(2). After an ALJ adjudicates the complaint—whether brought by the Special Counsel or by the aggrieved party—the parties may request review of the ALJ's decision in front of the U.S. court of appeals for the circuit in which the violation is alleged to have occurred. *Id.* § 1324b(i); *see, e.g.*, *Ogunrinu v. Off. of Chief Admin. Hearing Officer*, No. 21-1151, 2023 WL 2618686 (D.C. Cir. Mar. 24, 2023) (court of appeals reviewing charges brought through designated administrative process for documentary abuse, when government had declined to prosecute); *Galindo v. Off. of the Chief Admin. Hearing Officer*, 856 F. App'x 746 (10th Cir. 2021) (court of appeals reviewing, *inter alia*, ALJ decision rendered after IER section declined to pursue documentary abuse case for lack of jurisdiction).

In sum, when the IER section rejected her claim, whether on jurisdictional grounds or on the merits, *see* Pl.'s Amend. Opp'n at 19 (emphasizing that the IER section declined to prosecute based on jurisdiction, not on merits), plaintiff could nonetheless have filed her claim in front of an ALJ and then appealed to the D.C. Circuit had she not obtained the result she sought. Her failure to take the steps prescribed by Congress for enforcing § 1324b precludes adjudication of her claims here. Accordingly, Count Two is dismissed for failure to state a claim.

## C. Count Three: Gross Negligence

Plaintiff alleges that NPR was "grossly[ ]negligent" toward her because NPR "had a contractual duty to Plaintiff as her employer to keep her H-1B status valid, breached this duty by failing to timely file Plaintiff's visa paperwork and perform the appropriate I-9 verification, and therefore caused Plaintiff's legal status in the United States to end and her employment capabilities to terminate." Compl. ¶¶ 155-156.

Under District of Columbia law, a negligence action requires that the plaintiff show (1) "a duty of care owed by the defendant to the plaintiff"; (2) "a breach of that duty"; and (3) "damage to the interests of the plaintiff, proximately caused by the breach."  *Simms v. District of Columbia*, 699 F. Supp. 2d 217, 227 (D.D.C. 2010) (quoting *Wash. Metro. Area Transit Auth. v. Ferguson*, 977 A.2d 375, 377 (D.C. 2009)).  District of Columbia law does not recognize a separate cause of action for gross negligence.  *Hernandez v. District of Columbia*, 845 F. Supp. 2d 112, 115 (D.D.C. 2012).  As support for a separate claim of gross negligence, plaintiff cites an inapposite case, in which "gross negligence" was an element of a statutory cause of action dealing with liability of D.C. municipal employees, a totally different context than applicable here.  *See* Pl.'s Amend. Opp'n at 21-22 (citing *District of Columbia v. Walker*, 689 A.2d 40, 44-45 (D.C. 1997)); *see also Hernandez*, 845 F. Supp. 2d at 115-16 (explaining why *Walker* does not stand for a separate gross negligence cause of action).  No freestanding tort of gross negligence is available in this jurisdiction.

Even if such a cause of action did exist, plaintiff has not sufficiently pleaded even ordinary negligence and thus could not meet the standard for gross negligence.  Plaintiff fails to allege any relevant duty owned by NPR to plaintiff, as required to sustain a negligence cause of action.  *Simms*, 699 F. Supp. 2d at 227 (explaining that a negligence action must allege "a duty of care owed by the defendant *to the plaintiff*" (emphasis added and internal quotation marks omitted)).  To be sure, employers have a legal duty to verify at the time of hire that an employee is legally authorized to work in the United States.  8 U.S.C. § 1324a(b).  Employers who hire employees with temporary work authorization also have a legal duty to re-verify on the I-9 form "not later than the date work authorization expires."  8 C.F.R. § 274a.2(b)(1)(vii).  Crucially, I-9 verification is required by the same sub-paragraph of the U.S. Code that makes it unlawful to "hire . . . for

employment in the United States an alien knowing the alien is an unauthorized alien . . . with respect to such employment." 8 U.S.C. § 1324a(a)(1)(A), (B).  In other words, the statute prohibits the hiring of undocumented aliens and then requires employers to ensure they are complying with the law by regularly verifying employees' documentation.  *Id.*  Nothing in the text of § 1324a implies either that employers are required to maintain their employees' immigration status by obtaining H-1B visas for them, or that the I-9 verification process itself has any causal effect on an employee's immigration status, as plaintiff implies.  *See* Compl. ¶ 155 (arguing that NPR "fail[ed] to timely file Plaintiff's visa paperwork and perform the appropriate I-9 verification, and therefore caused Plaintiff's legal status in the United States to end and her employment capabilities to terminate"); *see* 8 C.F.R. § 274.2(b)(1)(vii) ("If an individual's employment authorization expires, the employer . . . must reverify . . . that the individual is still authorized to work in the United States; otherwise, the individual may no longer be employed . . . .").  Thus, the I-9 verification process is a duty the employer owes *to the government*, not to the employee.

Totally absent from the Complaint are any allegations that NPR made promises to plaintiff to remind her, or otherwise obtain for her, necessary work authorization.  For example, plaintiff does not allege that, prior to February 2021 when her STEM OPT work authorization expired, NPR promised or undertook to assist her in obtaining an H-1B visa or otherwise obtaining work authorization.  *See* Compl. ¶ 27.  Rather, according to plaintiff, in July 2019, when NPR last completed an I-9 verification for her, NPR "provided guidance on STEM OPT requirements," as that was the visa she held at the time.  *Id.*  Plaintiff suggests no basis, statutory or otherwise, for the claim that NPR owed her a duty to apply for an H-1B visa on her behalf prior to the expiration of her STEM OPT visa in February 2021.  Although plaintiff makes the conclusory statement that NPR "had a contractual duty to Plaintiff as her employer to keep her H-1B status valid," *id.* ¶ 155,

the Complaint is otherwise devoid of any allegation that, prior to 2023, NPR promised or even

offered to sponsor an H-1B visa on her behalf.  Thus, plaintiff can point to no source of a duty

owed by NPR *to her* to complete regular I-9 verifications, much less to have sponsored an H-1B

visa for her in 2021, when her status expired. Count Three is therefore dismissed for failure to state

a claim.

### D.  Count Four: Wrongful Termination

Plaintiff claims that NPR fired her in violation of public policy.  *Id.* ¶¶ 157-161.  A starting

point in evaluating a wrongful discharge in violation of public policy claim is the general

proposition that "in the District of Columbia . . . an employer may discharge an at-will employee

at any time and for any reason, or for no reason at all." *Adams v. George W. Cochran & Co., Inc.*,

597 A.2d 28, 30 (D.C. 1991).  A "very narrow exception" to the at-will doctrine has been

recognized in this jurisdiction when the "sole reason" for the employee's termination, *see Adams*,

597 A.2d at 33-34, "offends some 'mandate of public policy' that is 'firmly anchored in either the

Constitution or in a statute or regulation which clearly reflects the particular public policy being

relied upon,'" *Bilal-Edwards v. United Planning Org.*, 896 F. Supp. 2d 88, 93-94 (D.D.C. 2012)

(quoting *Carson v. Sim,* 778 F. Supp. 2d 85, 97 (D.D.C. 2011)).  In *Adams,* for example, the plaintiff

was fired for refusing to violate the law by driving a truck without a required inspection sticker on

its windshield.  *Adams*, 597 A.2d at 29-30.  The D.C. Court of Appeals explained that the plaintiff

"was forced to choose between violating the regulation and keeping his job—the very choice

which . . . he should not have been required to make.  Even though the criminal liability facing

him was not very great, it was nonetheless unacceptable and unlawful for his employer to compel

him to choose between breaking the law and keeping his job." *Adams,* 597 A.2d at 34.

26

The "'very narrow exception' created in *Adams* should not be read in a manner that makes it impossible to recognize any additional public policy exceptions to the at-will doctrine that may warrant recognition." *Carl v. Children's Hosp.*, 702 A.2d 159, 160 (D.C. 1997). In fact, since "*Carl,* this Court, the D.C. Court of Appeals, and the D.C. Circuit have created additional exceptions to the supposedly 'very narrow' public policy exception." *Coleman v. District of Columbia*, 828 F. Supp. 2d 87, 96 (D.D.C. 2011) ("[I]t appears that the public policy exceptions may be swallow[ing] up the at-will doctrine.") (alteration in original).

Notwithstanding the expansion of the "very narrow" public policy exception, an important limiting principle is that a plaintiff may not seek relief under a theory of wrongful discharge based upon a statute that carries its own remedy for violation. *See, e.g.*, *Carter v. District of Columbia,* 980 A.2d 1217, 1225-26 (D.C. 2009) (declining to create public policy exception where plaintiff's conduct "fell squarely under the aegis of the District's Whistleblower Protection Act," which "provides that an employee aggrieved by a prohibited personnel action may bring a civil action for monetary and equitable relief"); *McManus v. MCI Commc'ns Corp.*, 748 A.2d 949, 957 (D.C. 2000) (refusing to create a public policy exception for claims of discrimination because the District of Columbia Human Rights Act ("DCHRA") already protects the same public policy); *Stevens v. Sodexo, Inc.*, 846 F. Supp. 2d 119, 126 (D.D.C. 2012) (same); *Hicks v. Ass'n of Am. Med. Colls.*, 503 F. Supp. 2d 48, 55 (D.D.C. 2007) (holding that remedies under the Fair Labor Standards Act and District of Columbia Minimum Wage Act preclude application of wrongful discharge in violation of public policy); *Kakeh v. United Planning Org., Inc.*, 537 F. Supp. 2d 65, 72 (D.D.C. 2008) (noting that the District of Columbia Whistleblower Protection Act, False Claims Act, and District of Columbia False Claims Act contain "specific and significant remed[ies]" and cannot support a public policy exception to at-will employment). Thus, "[e]ven where there is a showing

of a clearly identifiable policy, the [Court] has refused to [set aside] the doctrine of at-will employment where the legislature has already created a specific, statutory cause of action to enforce the public policy at issue." *LeFande v. District of Columbia,* 864 F. Supp. 2d 44, 50 (D.D.C. 2012) (internal quotation marks omitted); *see also Kassem v. Wash. Hosp. Ctr.*, 513 F.3d 251, 254 (D.C. Cir. 2008) ("[T]he D.C. Court of Appeals held the [public policy] exception unavailable 'where the very statute creating the relied-upon public policy already contains a specific and significant remedy for the party aggrieved by its violation.'") (quoting *Nolting v. Nat'l Capital Grp., Inc.*, 621 A.2d 1387, 1390 (D.C. 1993)).

Plaintiff identifies two public policies which she contends justify further expansion of the exception to the general at-will rule.  First, plaintiff points to 8 U.S.C. § 1324b(a)(1), (a)(6), which, as discussed *supra* Part III.B, prohibits discrimination on the basis of national origin and, in some cases, citizenship status, including via "documentary abuse" such as demanding excessive paperwork to prove immigration status.  *See* Pl.'s Amend. Opp'n at 24; *see also* Compl. ¶¶ 159-160.  This cannot be the basis for a public policy exception to the general rule of at-will employment because the INA already provides a remedy for national origin, citizenship discrimination, and documentary abuse.  *See* 8 U.S.C. § 1324b(b)(1).

Second, she identifies Title VII's prohibition on national origin discrimination.  Pl.'s Amend. Opp'n at 24.  Yet, "Title VII provides Plaintiff with a potential remedy for her alleged . . . discrimination and retaliation claims, . . . and therefore this claim falls outside the purview of the limited public policy exception permitting wrongful discharge claims by at-will employees." *Lockhart v. Coastal Int'l Sec., Inc.*, 5 F. Supp. 3d 101, 107 (D.D.C. 2013) (internal quotation marks omitted) (citing *Hoskins v. Howard Univ.*, 839 F. Supp. 2d 268, 281 (D.D.C. 2012)).

In short, plaintiff points to no public policy that would defeat NPR's entitlement to fire her as an at-will employee, and she presents no other exception to the general at-will employment rule, so her wrongful termination claim must be dismissed for failure to state a claim.[7]

### E. Count Five: Promissory Estoppel

Plaintiff argues that NPR "clearly demonstrated an intent to keep Plaintiff as an employee at least until 2027" and is therefore liable under a theory of promissory estoppel for terminating her before that time.  Compl. ¶ 164.  "Promissory estoppel provides a party with a remedy to enforce a promise where the formal requirements of a contract have not been satisfied, often serving as a substitute for one of these formal requirements . . . ." *Vila v. Inter-Am. Inv. Corp.*, 570 F.3d 274, 279 (D.C. Cir. 2009).  To recover on a theory of promissory estoppel, the plaintiff must [1] show "evidence of a promise, [2] the promise must reasonably induce reliance upon it, and [3] the promise must be relied upon to the detriment of the promisee."  *Wallace v. Eckert, Seamans, Cherin & Mellot, LLC*, 57 A.3d 943, 958 (D.C. 2012) (quoting *Simard v. Resolution Tr. Corp.*, 639 A.2d 540, 552 (D.C. 1994)); *Plesha v. Ferguson*, 725 F. Supp. 2d 106, 111-12 (D.D.C. 2010); *Leyden v. Am. Accreditation Healthcare Comm'n*, 83 F. Supp. 3d 241, 247 (D.D.C. 2015).

Plaintiff identifies the promise NPR made as its "actions in attempting to secure an H-1B Visa for Plaintiff," which, in her view "clearly demonstrated an intent to keep Plaintiff as an employee at least until 2027."  Compl. ¶ 164.  As support for this alleged promise, plaintiff points to the Labor Condition Application submitted by NPR to the Department of Labor in June 2023 as a prerequisite for sponsoring an H-1B visa for Plaintiff.  *Id.* ¶ 66.  That application requested approval for a period of employment from June 2023 to June 2026, which plaintiff understood to

---

[7]      Plaintiff's original and now stricken opposition acknowledges that "true compliance" with federal immigration law would have "require[d]" NPR to "terminat[e] Plaintiff" "immediately . . . upon learning of her status issue," Pl.'s Opp'n Mem. at 15, a point hard to square with her contention that NPR acted unlawfully by firing.

mean that NPR intended to employ her until 2027. *Id.* ¶¶ 66, 164. Nowhere does plaintiff allege, however, any direct statement from anyone at NPR about promising to employ her until 2027.[8] "[D]emonstration of a promise is a prerequisite to invocation of the doctrine of promissory estoppel." *Simard*, 639 A.2d at 552 (alteration in original) (quoting *U.S. Jaycees v. Bloomfield*, 434 A.2d 1379, 1384 (D.C. 1981)). While plaintiff alleges that NPR's counsel said NPR was "committed to supporting her," Compl. ¶ 56, and that NPR pursued ways to remedy her lapsed immigration status, *id.* ¶¶ 57, 87, the Complaint alleges no explicit or implied promise to employ her for any specific period or to rehire her. Where D.C. law has allowed a promissory estoppel claim to defeat the presumption of at-will employment, an express promise has been made either not to fire someone for a specific reason, *see, e.g.*, *Leyden*, 83 F. Supp. 3d at 247, or to employ an individual for a specific period of time, *see, e.g.*, *Woodruff v. Nat'l Opinion Rsch. Ctr.*, 505 F. Supp. 2d 138 (D.D.C. 2007) (employer "specifically and falsely informed [new employee] that he would be employed for the length of" a contracted-for project). Plaintiff here alleges no such promise, or anything close, so her promissory estoppel claim is dismissed.

### F. Count Six: Fraudulent Misrepresentation

Plaintiff alleges that NPR's counsel, Stuart Harding, fraudulently misrepresented to her on May 23, 2023, that if she left the United States, she might be unable to return because of "the risk of an alleged 10-year travel ban with China," Compl. ¶ 57, and on August 30, 2023, that due to a "travel ban in place at the time," if Plaintiff went to China, she would not be able to return, *id.* ¶¶ 78, 169. "To plead a *prima facie* claim for fraudulent misrepresentation, a plaintiff must allege

---

[8]    Plaintiff's briefing supplements her allegations in the Complaint, indicating that her supervisor, Kristin Hume, told her that her role would "resume as soon as the visa was approved," and that Harding told her that her employment would resume when the visa was granted. Pl.'s Amend. Opp'n at 25-26. These supplemental allegations fall far short of a promise by NPR to continue her employment to 2027.

'(1) a false representation (2) in reference to a material fact, (3) made with knowledge of its falsity, (4) with intent to deceive, and (5) action [] taken in reliance upon the representation.'" *Rodriguez v. Lab'y Corp. of AmericaHoldings*, 13 F. Supp. 3d 121, 128-29 (D.D.C. 2014) (alteration in original) (quoting *Atraqchi v. GUMC Unified Billing Servs.*, 788 A.2d 559, 563 (D.C. 2002)). Under Federal Rule of Civil Procedure 9(b), a fraud claim must be pled "with particularity" as to the "circumstances constituting fraud or mistake," FED. R. CIV. P. 9(b), including "the time, place and content of the false misrepresentations, the fact misrepresented and what was obtained or given up as a consequence of the fraud," *United States ex rel. Joseph v. Cannon*, 642 F.2d 1373, 1385 (D.C. Cir. 1981).

In general, "[o]pinions or predictions of future events do not constitute representations of material fact upon which a plaintiff successfully may place dispositive reliance." *Boomer Dev., LLC v. Nat'l Ass'n of Home Builders of U.S.*, 258 F. Supp. 3d 1, 13 (D.D.C. 2017) (quoting *Howard v. Riggs Nat'l Bank*, 432 A.2d 701, 706 (D.C. 1981)). In some cases, representations about future events have formed the basis for fraudulent misrepresentation claims when the defendant misrepresented "either his current intent to perform [a future act] or his existing knowledge concerning the likelihood that an event would occur in the future." *Chedick v. Nash*, 151 F.3d 1077, 1081 (D.C. Cir. 1998). For instance, in *Boomer*, the defendant builders' association represented to a client that the association had reviewed and partnered with a particular financial services company that could finance the client's project, but the association had in fact conducted no review of the financial services company, which turned out to be running a fraudulent investment scheme. *Boomer*, 258 F. Supp. 3d at 5. The fraudulent misrepresentation was not the association's prediction that the financial services company would finance the client's project, but

rather the defendant's "representations that the [defendant] had some factual basis for its stated opinions,'" namely the review claimed to have been conducted. *Id.* at 15.

Even taking as true plaintiff's allegations, Harding's March 23, 2023, statement that there might be, in the future, a travel ban against China was a "prophecy or prediction" which "is not actionable upon its nonconcurrence" because such a prediction does not constitute a false statement of material fact. *Bennett v. Kiggins*, 377 A.2d 57, 61 (D.C. 1977). Harding had no control over or proprietary knowledge about whether the government would eventually implement a travel ban against China and, at most, was characterizing a risk (accurately or inaccurately) of plaintiff traveling abroad while her visa process was unresolved. To be sure, plaintiff appears to have relied on Harding's May 23 statement and resultantly delayed returning to China, leading her to miss the last months of her mother's life. Compl. ¶ 57. Nonetheless, this statement cannot form the basis for a claim of fraudulent misrepresentation because plaintiff did not allege a false statement of material fact.

Harding's August 30, 2023, statement that there was a *current* travel ban against China appears to be factual statement that could form the basis for a claim. *Id.* ¶ 78. Another essential element is missing, however: plaintiff does not allege that she relied on this statement to her detriment. *Rodriguez*, 13 F. Supp. 3d at 128-29. That same evening, despite Harding's alleged false statement, plaintiff "booked a flight to Beijing for August 31, 2023, . . . to attend her mother's funeral." Compl. ¶ 79. She attended her planned visa appointment on September 12 at the embassy in Beijing, *id.* ¶ 80, and eventually returned to the United States without regard to Harding's warning, *id.* ¶ 85. Thus, plaintiff appears to have behaved exactly as she would have had Harding not told her, allegedly falsely, on August 30, 2023, that she would not be able to return to the United States if she left.

Since each of the statements alleged by plaintiff with the specificity required by Federal Rule of Civil Procedure 9(b) lacks essential elements of a fraudulent misrepresentation claim, and plaintiff does not so much as suggest facts that would satisfy those elements, much less plausibly allege them, Count Six will be dismissed for failure to state a claim.

### G. Count Seven: Intentional Infliction of Emotional Distress

Finally, plaintiff alleges that NPR's "malicious actions during the time when [she] was mourning the recent death of her mother," such as "promises broken by Defendant to rehire Plaintiff, fraudulent misrepresentations committed by Defendant in an attempt to cover up Defendant's culpability with regard to missing the due date for Plaintiff's H-1B Visa application, discriminatory actions by Defendant against Plaintiff by unilaterally not accepting her H-1B Visa as valid, and uncertainties experienced by Plaintiff with regard to her ability to remain in the United States as a result of Defendant's refusal to rehire her," constituted intentional infliction of emotional distress. Compl. ¶ 178. In briefing, plaintiff slightly recasts her claim based on facts alleged in the Complaint, arguing that NPR tortiously and intentionally caused her emotional distress by telling her in March 2023, via its counsel Harding, that a travel ban against China could be instituted and that she should stay in the United States, causing her to miss the last months of her mother's life. Pl.'s Amend. Opp'n at 31.

"There is no general duty of care to avoid causing mental distress, and liability is not imposed for all conduct which causes mental distress." *Duncan v. Children's Nat'l Med. Ctr.*, 702 A.2d 207, 211 (D.C. 1997). "The elements of [IIED] are (1) extreme and outrageous conduct that (2) intentionally or recklessly caused (3) severe emotional distress to another." *Cooke-Seals v. District of Columbia*, 973 F. Supp. 184, 188 (D.D.C. 1997) (quoting *Jonathan Woodner Co. v. Breeden,* 665 A.2d 929, 935 (D.C. 1995), *amended* 681 A.2d 1097 (D.C. 1996), *cert. denied,* 519

U.S. 1148 (1997)).  For conduct to be "extreme and outrageous," the actions must have been "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  *Bernstein v. Fernandez*, 649 A.2d 1064, 1075 (D.C. 1991) (quoting Restatement (2d) of Torts § 46 cmt. d (1965)).  "In the employment context, courts within the District of Columbia 'traditionally have been demanding in the proof requested to support an intentional infliction of emotional distress claim.'" *Tiefenbacher v. Am. Ass'n of Retired Persons*, No. 05-cv-1802 (CKK), 2006 WL 1126841, *3 (D.D.C. Apr. 27, 2006) (quoting *Kerrigan v. Britches of Georgetowne, Inc.*, 705 A.2d 624, 628 (D.C. 1997)).

To survive dismissal, plaintiff need only "plausibly" allege facts that could satisfy those elements, and all inferences are drawn in her favor.  *VoteVets Action Fund*, 992 F.3d at 1104. Nonetheless, even at the motion to dismiss stage, a plaintiff must "allege in [the] complaint conduct that was 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency.'"  *Williams v. District of Columbia*, 9 A.3d 484, 494 (D.C. 2010) (quoting *Bernstein*, 649 A.2d at 1075).  When the alleged acts mentioned in the complaint are "not the type for which liability may be imposed for this particular tort," an IIED claim must be dismissed, notwithstanding the requirement that the facts be viewed in the light most favorable to the plaintiff. *Id.* (quoting *Crowley v. N. Am. Telecomm. Ass'n*, 691 A.2d 1169, 1171 (D.C. 1997)); *see de Sousa v. Embassy of Republic of Angola*, 267 F. Supp. 3d 163, 172-73 (D.D.C. 2017) (Howell, C.J.) (concluding that insults, threats, and efforts to cause plaintiff to lose a government contract were not "extreme and outrageous" enough to survive a motion to dismiss IIED claim); *Duncan*, 702 A.2d at 211 (assessing whether conduct was "extreme and outrageous as a matter of law," by taking into consideration "community standards, the nature of the activity at issue, the relationship

between the parties, and the particular environment in which the conduct took place").

Plaintiff undoubtedly suffered "severe emotional distress," *Cooke-Seals*, 973 F. Supp. at 188, from missing the last few months of her mother's life, from the death of her mother, and from the stress of navigating a complex visa process immediately after her mother's death, without, in her view, reliable support from her employer. She has not, however, pled facts that plausibly raise the inference that NPR engaged in "extreme and outrageous conduct." *Cooke-Seals*, 973 F. Supp. at 188. "[G]enerally, employer-employee conflicts do not rise to the level of outrageous conduct," *Duncan*, 702 A.2d at 211-12, even if IIED claims by employees against employers are not barred, *id.* at 212 n.4. The actions described by plaintiff of terminating or declining to rehire her, even if those decisions affected her immigration status, is not conduct by an employer that is "atrocious[] and utterly intolerable in a civilized community." *Bernstein*, 649 A.2d at 1075. Nor can an employer advising an employee of the potential immigration consequences of travel abroad, even erroneously, *see* Compl. ¶ 57, or failing to share a document addressed to the employer, *id.* ¶ 78, be construed as "beyond all possible bounds of decency," *id.* Under D.C. law, courts evaluating facts more egregious than these have found that plaintiffs failed to state an IIED claim. *See Duncan*, 702 A.2d at 209-10 (upholding dismissal of IIED claim by pregnant employee compelled to choose between exposure to radiation and termination from job); *Islar v. Whole Foods Mkt. Grp., Inc.*, 217 F. Supp. 3d 261, 264 (D.D.C. 2016) (dismissing IIED claim of African American employee alleging racial discrimination when he was fired after being reprimanded for events that occurred on days he was not working); *Tiefenbacher*, 2006 WL 1126841, at *1 (dismissing IIED claim where employee's supervisor shouted "demeaning, vulgar expletives" at employee, company leadership responded in a "hostile and threatening ma[nn]er," and company eventually terminated her (internal quotation marks omitted)); *Morris v. Carter Glob. Lee, Inc.*, 997 F. Supp.

2d 27, 42 (D.D.C. 2013) (dismissing IIED claim when prison contracting company accused employee of mistreating prisoners, fired him, and walked him off the premises, causing "indignity and humiliation"); *Payne v. District of Columbia*, 773 F. Supp. 2d 89, 93-94, 102 (D.D.C. 2011) (dismissing IIED claim when employer pressed criminal charges against employee and then fired him).  Plaintiff's IIED claim is dismissed for failure to state a plausible claim.

### H. Sanctions

Under 28 U.S.C. § 1927, "[a]ny attorney . . . who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct."[9]  The D.C. Circuit has held that § 1927 applies when an attorney has so multiplied the litigation "at least reckless[ly]." *U.S. v. Wallace*, 964 F.2d 1214, 1217-21 (D.C. Cir. 1992) (internal quotation marks omitted). Typically, that will involve either "repeated or singularly egregious" behavior.  *Id.* at 1221.

Plaintiff's counsel submitted a brief in opposition to defendant's Motion to Dismiss that was littered with fictitious or mischaracterized citations.  *See* Pl.'s Opp'n Mem.  Specifically, two case citations appeared to be entirely fabricated, and eight were so seriously mischaracterized that they rendered the entire brief unreliable.[10]  As examples, plaintiff cites *Howard Univ. v. Best*, 484

---

[9]    Attorneys' conduct may also be sanctioned under Federal Rule of Civil Procedure 11 or under the Court's inherent powers to manage its own proceedings.  Neither source is relied upon here.  Attorneys' fees may not be imposed under Rule 11 unless "imposed on a motion," FED. R. CIV. P. 11(c)(4); *Nuwesra v. Merrill Lynch Fenner & Smith Inc.*, 174 F.3d 87, 94 (2d Cir. 1999); *Williams v. Romarm S.A.*, No. 19-cv-183 (EGS), 2020 WL 1557156, *6 (D.D.C. Apr. 1, 2020).  Though NPR indicated that, in its view, sanctions were warranted, *see* Def.'s OTSC Resp. at 3, no motion was filed.  *See* FED. R. CIV. P. 11(c)(2) (requiring motions for sanctions to made separately from any other motion).  Courts also possess inherent power to sanction misbehavior occurring before them when that behavior is done in bad faith.  *Ali v. Tolbert*, 636 F.3d 622, 627 (D.C. Cir. 2011) ("To support a sanction under this authority, the court must make a finding by clear and convincing evidence that Noble committed sanctionable misconduct that is tantamount to bad faith.").  Whether plaintiff's counsel acted in bad faith is not considered.

[10]    As described in the OTSC (Oct. 15, 2025), the following two cases are entirely fictitious: "*Krishna v. Colgate Palmolive Co.*, 2018 WL 2017613 (D.D.C. Apr. 30, 2018)"; "*Perez v. Horizon Lines, Inc.*, 804 F. Supp. 2d 1 (D.D.C. 2011)."  *See* Pl.'s Opp'n Mem. at 10, 14.  Eight additional cases were seriously mischaracterized, *see id.* at 10, 18, 19, 21, 22, 25, 28-29.

A.2d 958, 985 (D.C. 1984), for the elements of a fraudulent misrepresentation claim, *see* Pl.'s Opp'n Mem. at 22, when that case addressed no such claim.  Further, plaintiff describes *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 87 (2d Cir. 2015), as "recognizing" that "conditioning employment on excessive immigration barriers can constitute adverse action when rooted in discriminatory intent," Pl.'s Opp'n Mem. at 10, when *Vega* involved a Puerto Rican plaintiff in the United States and therefore did not address immigration issues.

Plaintiff's counsel explained that, while using Google and other search tools to find authority for the opposition brief, he relied upon "summaries" generated by Google that he was "not even aware . . . were being generated by artificial intelligence." Pl.'s OTSC Resp. at 2.  These summaries "linked to purportedly legitimate case databases," such as "VLex," and plaintiff's

(1)  *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 87 (2d Cir. 2015), described as "recognizing" that "conditioning employment on excessive immigration barriers can constitute adverse action when rooted in discriminatory intent," when the *Vega* did not involve an immigration issue;

(2)  *Robertson v. District of Columbia*, 269 A.3d 1022 (D.C. 2022), described as holding that "employer conduct must be evaluated in full context when assessing public policy violations," when *Robertson* declined to consider the merits of a wrongful termination claim based on public policy because remedies were available under antidiscrimination laws;

(3)  *Myers v. Alutiq*, 811 F. Supp. 2d 261 (D.D.C. 2011), described as "recogniz[ing]" that "employers cannot skirt responsibility for visa-related harm that they themselves cause," when the plaintiff in *Myers* was allegedly terminated for whistleblowing about violations of federal acquisitions law and the case involved no visa or immigration issues;

(4)  *Lockhart v. Coastal Int'l Sec., Inc.*, 905 F. Supp. 2d 105, 115 (D.D.C. 2012) (Howell, J.), described as supporting proposition that the facts in the instant case "exemplif[y] the 'close fit' between employer conduct and public policy harm recognized in *Lockhart*," even though *Lockhart* does not contain the quotation "close fit" or reach the merits of any wrongful termination claim;

(5)  *Bible Way Church of Our Lord Jesus Chris v. Beards*, 680 A.2d 419, 432-33 (D.C. 1996), described as stating that a "promissory estoppel claim [is] viable where conduct and assurances created reasonable expectations," when no promissory estoppel claim was on appeal in *Bible Way*;

(6)  *Rodriguez v. Lab'y Corp. of Am. Holdings*, 13 F. Supp. 3d 121, 128-29 (D.D.C. 2014), described as "confirm[ing] that intentional concealment of material facts, particularly where the defendant owes a duty to disclose, can support a fraud claim," when *Rodriguez* denied a fraudulent misrepresentation claim that did not include allegations of concealment;

(7)  *Howard Univ. v. Best*, 484 A.2d 958, 985 (D.C. 1984), for the elements of a fraudulent misrepresentation claim, when *Howard Univ.* does not address any fraudulent misrepresentation claim;

(8)  *Larijani v. Georgetown Univ.*, 791 F. App'x 306 (D.C. Cir. 2020), which may be incorrect citation to *Larijani v. Georgetown Univ.*, 791 A.2d 41 (D.C. 2002), and is cited as sustaining an intentional infliction of emotional distress ("IIED") claim "where employer misled immigrant professor about visa and employment status," when *Larijani*, 791 A.2d 41, involved an employer who insisted on playing loud noise machines near plaintiff employee and involved no immigration or visa issues, and 791 F. Appx 306, cited by plaintiff, is the reporter number for *Devon Drive Lionville, LP v. Parke Bancorp, Inc.*, a Third Circuit case involving no IIED claims.

counsel therefore apparently relied upon them as accurate.  *Id.*  Plaintiff's counsel provided a somewhat opaque response to the Court's queries, admitting that the two entirely fictitious citations came from these Google summaries, but equivocating on whether the misleading characterizations of the other eight cases identified in the OTSC resulted from the same use of Google summaries or whether they were human-generated overstatements of those cases' relevance.  For instance, as to *Howard Univ.*, which was included as the sole citation after a sentence listing the elements of fraudulent misrepresentation despite not involving any such claim, plaintiff stated that "[t]he case . . . was cited in good faith to illustrate the severity of employer conduct that can cause profound emotional and professional harm."  *Id.* at 9.  As to *Vega*, with which plaintiff included the parenthetical description, "recognizing that denying work authorization or conditioning employment on excessive immigration barriers can constitute adverse action when rooted in discriminatory intent," despite that case involving no immigration issues whatsoever, plaintiff now states that "[t]he citation was included to illustrate the framework for evaluating discriminatory intent under Title VII, not to mischaracterize the holding."  *Id.* at 5.  Plaintiffs' response left somewhat ambiguous exactly how these erroneous citations were created.

Even if plaintiff's attorney composed these descriptions himself, rather than pulling them from an automatically generated Google summary, the descriptions are so far removed from the content of the cases that substantial parts of plaintiff's brief depended on cases that were grossly mischaracterized.  The descriptions go well beyond spinning cases in a favorable way or misreading the details.  *See, e.g.*, Pl.'s Opp'n Mem. at 21 (citing *Bible Way Church of Our Lord Jesus Chris v. Beards*, 680 A.2d 419, 432-33 (D.C. 1996), with parenthetical reading "promissory estoppel claim [is] viable where conduct and assurances created reasonable expectations," when no promissory estoppel claim was on appeal in *Bible Way*).  If, on the other hand, the erroneous

descriptions were generated by artificial intelligence features in Google, plaintiff's counsel nonetheless apparently failed to read at least 10 cases cited in the brief, relying on the fact that summaries appearing on a search engine's results page "linked" to "legitimate case databases." *Id.* at 2. Including ten grossly mischaracterized cases in a single brief is "singularly egregious," and whether that resulted from plaintiff's counsel knowingly mischaracterizing the cases or simply failing to read them, such behavior is sufficiently "reckless" to warrant sanctions. *Wallace*, 964 F.2d at 1220.

As a result of plaintiff's error-ridden and unreliable brief, both NPR and the Court expended time identifying which citations were real. The brief was stricken as unreliable, and plaintiff filed a new opposition brief, prompting NPR to file a new reply. This "unreasonably" "multiplie[d] the proceedings" in this case by forcing a second round of briefing on NPR's motion to dismiss. 28 U.S.C. § 1927.

Therefore, plaintiff's counsel, Lev Ivan Gabriel Iwashko, will be ordered to pay reasonable attorneys' fees and costs associated with defendant's initial reply to the flawed and now stricken opposition brief and with defendant's response to the Court's Minute Order (Oct. 23, 2025).

## IV.    CONCLUSION

For the foregoing reasons, NPR's Motion to Dismiss, ECF No. 8, is GRANTED as to all counts of the Complaint, ECF No. 1. Additionally, Lev Ivan Gabriel Iwashko is DIRECTED to reimburse NPR for the reasonable attorneys' fees and costs associated with NPR's responses to plaintiff's initial flawed and now stricken opposition brief and the Court's OTSC, with further directions to be set out in the order that will be contemporaneously filed.

Date: December 18, 2025

_____
**BERYL A. HOWELL**
United States District Judge
